819 A.2d 529

Danny A. STONER, Appellant,

v.

Mary Alice STONER, Appellee.

Supreme Court of Pennsylvania.

Submitted Oct. 25, 2002.

Decided March 19, 2003.

666

Kimberly Hamilton, Bellefonte, for Danny A. Stoner.

Jeffrey W. Stover, Bellefonte, for Mary Alice Stoner.

Before CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION

Chief Justice CAPPY.

■ We granted the petition for allowance of appeal to address whether a postnuptial agreement is a valid and enforceable contract even though it did not disclose the statutory rights to which a spouse is entitled. For the reasons herein,

we conclude that such an agreement is enforceable, and accordingly, we reverse the order of the Superior Court.[1]

Appellant Danny A. Stoner ("Husband") and Appellee Mary Alice Stoner ("Wife") were married on April 9, 1994, and separated in July 1999. This was not the first marriage for either party; no children were born of the union.

The parties' relationship deteriorated, and on November 22, 1999, Husband filed a Complaint in Divorce, requesting a decree of divorce and a determination and disposition of the marital assets. Shortly thereafter, Wife and Husband agreed to meet in order to discuss distribution of their assets.[2] Wife requested that Husband provide her with $10,000. Husband claimed that as a result of debts that she had left him, he was only able to pay her $6,000. Wife agreed.

The next day, Husband went to Beneficial Finance to secure a line of credit in order to pay Wife the negotiated amount. Wife appeared at the loan office, and became upset when she learned that there was a three-day waiting period before the funds could be obtained. Husband agreed to pay her $100 on that day, and she stated that she would give him $500 of the $6,000 he was about to borrow.

At Husband's request, his daughter typed a statement setting forth the terms of the parties' agreement. On Decem-

---

1. As this issue involves a question of law, our standard of review is de novo, and our scope of review is plenary. *See Buffalo Township v. Jones*, 813 A.2d 659, 664 n. 4 (Pa.2002).

2. According to Husband's testimony, the parties' assets included a marital residence, a joint checking account, and Husband's retirement account with an estimated value of $54,000. The bulk of the retirement account was premarital, having been earned during the twenty-one years that Husband worked as a truck driver for Davidson Brothers. When Husband left that position, Wife assisted him in rolling over his retirement account into a new account and periodically discussed with him the performance of the account.

With regard to the marital residence, Husband purchased the home in 1988, prior to the marriage. Nearly one year before the separation, the house was appraised for approximately $80,000, and it was refinanced for $75,000. Since the separation, Husband has been paying on all of the debts including a loan which Husband co-signed for Wife's adult son; Wife was responsible for the expenses on a Discover credit card.

ber 3, 1999, Husband and Wife met at the American Automobile Association where they signed the statement and had it notarized ("the Agreement"). The Agreement in its entirety states as follows:

I, Mary Alice Stoner, received a $6,000.00 check from Danny A. Stoner on December 3, 1999, as a final cash settlement in our divorce proceedings. This money is the total amount agreed upon by both parties and no other financial obligations need to be met by Danny A. Stoner for Mary Alice Stoner. Mary Alice Stoner, by receiving this settlement, agrees to sign all divorce papers and also sign off of Danny A. Stoner's retirement funds.

Agreement, dated December 3, 1999.

Husband gave Wife a check for $6,000. Wife cashed the check and gave Husband $500.

In May of 2000, through counsel, Wife served Husband with written interrogatories in the pending divorce case. When Husband failed to answer the Interrogatories, Wife filed a Motion for Enforcement and Sanctions on July 7, 2000. On July 21, 2000, Husband filed a Petition for Enforcement of Agreement, requesting that the court enforce the Agreement pursuant to 23 Pa.C.S.A. § 3105.[3] Following a hearing, the trial court granted the Petition for Enforcement, denied the Motion for Enforcement and Sanctions, and ordered Wife to execute an affidavit of consent to the divorce and sign the necessary paperwork to relinquish her interest in Husband's retirement funds. A motion for reconsideration was denied.

On appeal, a panel of the Superior Court reversed in a split decision. The majority determined that Wife had received a full and fair disclosure of the marital assets. However, relying on *Ebersole v. Ebersole,* 713 A.2d 103 (Pa.Super.1998),

**3.** Section 3105 is entitled "Effect of agreement between parties". Subsection (c) states in pertinent part:

(c) **Certain provisions not subject to modification.**—In the absence of a specific provision to the contrary appearing in the agreement, a provision regarding the disposition of existing property rights and interests between the parties, alimony, alimony pendente lite, counsel fees or expenses shall not be subject to modification by the court.
23 Pa.C.S.A. § 3105(c).

*alloc. denied,* 559 Pa. 678, 739 A.2d 543 (1999), the court held that the Agreement was invalid because it did not adequately disclose the statutory rights that Wife was relinquishing. The court determined that to satisfy the disclosure requirement, the agreement must mention all statutory rights to which Wife was entitled, including equitable distribution, alimony and alimony *pendente lite.* Judge Cavanaugh dissented on the basis that under *Simeone v. Simeone,* 525 Pa. 392, 581 A.2d 162 (1990), there is no longer any requirement that Wife be informed that she was relinquishing her statutory rights by entering into the agreement. This appeal followed.

The sole issue raised by Husband is whether, in the absence of a specific disclosure of all statutory rights to which a spouse is entitled, an uncounseled postnuptial agreement between the parties is a valid and enforceable contract.

As both parties argue that *Simeone, supra,* supports their respective positions, we turn our attention to that case. In *Simeone,* Wife filed a claim for alimony *pendente lite* after divorce proceedings were initiated. However, Wife and Husband had signed a prenuptial agreement which limited support payments to her, and expressly stated that alimony *pendente lite* was being relinquished. The lower courts upheld the prenuptial agreement and this court affirmed. We clarified that Wife's claim was "not that the agreement failed to disclose the particular right affected, but rather that she was not adequately informed with respect to the nature of alimony *pendente lite.*" *Id.* at 164.

We granted allowance of appeal in *Simeone* because the Superior Court had expressed uncertainty regarding the meaning of our plurality decision in *In re Estate of Geyer,* 516 Pa. 492, 533 A.2d 423 (1987). Consequently, we began our analysis by addressing the rationale espoused in *Geyer.* We recognized that *Geyer* followed and applied the earlier case of *In re Estate of Hillegass,* 431 Pa. 144, 244 A.2d 672 (1968). In *Hillegass,* the court determined that a prenuptial agreement would be upheld if it either made a reasonable provision for the spouse or was made after a full and fair disclosure of financial status. *Simeone,* 581 A.2d at 164. In *Simeone,* we

questioned whether *Hillegass* was strictly followed by the *Geyer* plurality, given the last paragraph in *Geyer* which stated: "[A]ny agreement which seeks to change the duly enacted public policy of this Commonwealth must be based on nothing less than full and fair disclosure. Such disclosure must include both the general financial pictures of the parties involved, and evidence that the parties are aware of the statutory rights which they are relinquishing." 533 A.2d at 429–30 (original emphasis) (citation omitted).[4]

We decided to reevaluate *Geyer's* foundations and clarify the standards used to evaluate the validity of prenuptial agreements. Given the advances in equality between the sexes, we rejected the paternalistic assumptions in *Geyer* and its predecessors which allowed courts to examine the reasonableness of the parties' agreement and "allowed inquiries into whether parties had attained informed understandings of the rights they were surrendering." *Id.* at 166–67. Rather, we determined that prenuptial agreements should be evaluated under the same standards as were other contracts, and concluded that "[a]bsent fraud, misrepresentation, or duress, spouses should be bound by the terms of their agreements." *Id.* at 165. We further declined to impose a *per se* requirement that parties had to obtain independent legal counsel, as that would contravene traditional principles of contract law,

4. In a footnote, the *Geyer* plurality explained its reasons for adopting the requirement that the parties be made aware of their statutory rights:

We note that since *Hillegass* a number of our sister jurisdictions have adopted this tack. Some states have resolved this matter statutorily. [Citations omitted]. Other states have allowed their courts to resolve the matter. [Citations omitted].

In all instances, however, those jurisdictions have recognized that a party's execution of an antenuptial agreement represents his or her waiver of statutory rights; and since a waiver is defined as the intentional relinquishment of a known right, that right can only be "known" if there is full awareness of the governing law and the other party's assets.

533 A.2d at 430 n. 13. Thus, the *Geyer* plurality did not derive this principle with reference to any precepts of Pennsylvania law, but based on the statutory and case law from other jurisdictions. Neither party has indicated whether our General Assembly has made such a requirement explicit in the Divorce Code; we have not located any such provision.

and would be a paternalistic and unwarranted interference with the parties' freedom to contract. *Id.* at 166. Notably, however, the court in *Simeone* reaffirmed that "we do not depart from the longstanding principle that a full and fair disclosure of the financial positions of the parties is required." *Id.* at 166–67.

In the instant matter, Husband argues that under *Simeone,* the postnuptial agreement should be evaluated as any other contract. All that is required is full and fair disclosure of the parties' financial positions; inquiry into the reasonableness of the bargain or the parties' understanding is improper. Since there was no fraud, misrepresentation or duress, Husband argues that the Agreement should be enforced. According to Husband, the Superior Court's decision was an unwarranted interference with the parties' freedom to contract. Husband further asserts that requiring statutory rights to be disclosed will effectively invalidate all marital agreements entered into without the benefit of counsel, as agreements prepared by laypersons likely will not include such legal terms.

Wife recognizes that *Simeone* did not decide whether disclosure of statutory rights was required, since the issue in that case was whether the wife had to be adequately informed about the nature of alimony *pendente lite.* Nonetheless, Wife reasons that since *Simeone* did not expressly overrule the disclosure requirement of *Geyer,* that portion of *Geyer* remains good law. Wife claims that several Superior Court cases have interpreted *Simeone* to require both disclosure of statutory rights as well as a full and fair disclosure of the parties' financial positions. *See, e.g., Ebersole v. Ebersole,* 713 A.2d 103 (Pa.Super.1998), *alloc. denied,* 559 Pa. 678, 739 A.2d 543 (1999); *Mormello v. Mormello,* 452 Pa.Super. 590, 682 A.2d 824 (1996); *Adams v. Adams,* 414 Pa.Super. 634, 607 A.2d 1116 (1992), *alloc. denied,* 533 Pa. 617, 619 A.2d 699 (1993). *But see Colonna v. Colonna,* 791 A.2d 353 (Pa.Super.2001) (questioning holding in *Ebersole* ), *alloc. denied,* 569 Pa. 690, 803 A.2d 732 (2002). Because the Agreement does not address such items as alimony, counsel fees and support, and

because Husband did not demonstrate that Wife was aware of her statutory rights, Wife argues that the Agreement cannot be enforced. Wife claims that imposing such a requirement is no more burdensome than requiring disclosure of the parties' financial positions. Finally, Wife asserts that public policy mandates that agreements relating to the special relationship of marriage should not be treated as mere "business deals".

We find that Husband's analysis is the correct one. *Geyer* interjected a new element into the analysis by requiring evidence that the parties were aware of the statutory rights they were relinquishing. This requirement was not derived from Pennsylvania statutory or case law. Moreover, *Geyer* was a plurality opinion. Wife is correct that *Simeone* did not overrule the *Geyer* court's requirement, but neither did *Simeone* adopt that portion of *Geyer*. Thus, the requirement that a party be made aware of his or her statutory rights, set forth by the plurality in *Geyer*, has never been adopted by a majority of this court, and we decline to do so here.

Adopting such a requirement would contravene the guiding principles of *Simeone*.[5] The *Simeone* court explained that traditional contract rules should be applied to marriage agreements. We expressly rejected an approach which would allow the court to inquire into the reasonableness of the bargain, or the parties' understanding of the rights they were relinquishing. We decline to resurrect the paternalistic approaches to evaluating marriage contracts by requiring Husband to explain to Wife the statutory rights that she may be surrendering. Such an approach assumes that Wife lacks the intelligence or ability to protect her own rights. Instead, we endorse the parties' rights to freely contract, and thus decline to impose the additional inquiry as to whether the parties were sufficiently advised of their statutory rights.

■ Wife is correct to the extent that she asserts that marriage contracts should not be treated as mere "business

5. *Simeone* involved a prenuptial, rather than a postnuptial, agreement. However, the principles applicable to antenuptial agreements are equally applicable to postnuptial agreements, although the circumstances may slightly differ. *In re Ratony's Estate,* 443 Pa. 454, 277 A.2d 791, 793 (1971).

deals". Indeed, we recognized in *Simeone* that "[p]arties to these agreements do not quite deal at arm's length, but rather at the time the contract is entered into stand in a relation of mutual confidence and trust that calls for disclosure of their financial resources." 581 A.2d at 167 (citations omitted). In light of this unique relationship, we reaffirm the principle in *Simeone* that full disclosure of the parties' financial resources is a mandatory requirement. This requisite acknowledges that the parties stand in a closer relationship beyond that of professional acquaintances negotiating a commercial contract. However, for the reasons expressed above, we do not find that the spousal relationship warrants the extra requirement that the parties be advised of their statutory rights. Rather, we find that the right balance is struck by requiring full disclosure of financial assets, in conjunction with the protection of traditional contract remedies for fraud, misrepresentation or duress.

Therefore, we hold that a spouse may enforce a postnuptial agreement without having to demonstrate that statutory rights have been disclosed, either in the postnuptial agreement itself or through other evidence. To the extent that the Superior Court decisions in *Ebersole, Mormello* and *Adams* hold otherwise, they are disapproved.

Accordingly, the order of the Superior Court is reversed.