**Kathleen M. STACKHOUSE Appellant**

v.

**Gregory ZARETSKY Appellee.**

Superior Court of Pennsylvania.

Argued March 8, 2006.
Filed May 12, 2006.

Candice L. Komar, Pittsburgh, for appellant.

Gary G. Gentile, Pittsburgh, for appellee.

BEFORE: HUDOCK, ORIE MELVIN and KELLY, JJ.

OPINION BY KELLY, J.:

¶ 1 The instant matter is before us after remand by this Court to the trial court for reconsideration in light of significant changes in the controlling case law. The parties to this equitable distribution action appeal and cross appeal from an order concluding that their ante nuptial agreement contemplated division of property questions arising in circumstances of both divorce and death, and that the agreement acted as a waiver of marital claims other than those relating to the prior award to Appellant of alimony *pendent lite,* which was terminated by the order. Appellant's request for alimony was also denied, but an award to her of attorneys' fees in the amount of $80,000 was sustained. We affirm in part, reverse in part, and remand for further proceedings.

¶ 2 The parties to this matter, who met when they were co-workers at an engineering firm which used their services as translators in connection with a project in Russia, were married in June of 1981. Appellee, a Russian immigrant who arrived in this country in 1969, had been divorced from his first wife in 1976. Appellant's prior romantic relationship had dissolved in a dispute over money.

¶ 3 Shortly before the marriage, the parties met with a mutual friend and co-worker, corporate attorney Eli Krivoshia, seeking advice on the preparation of an ante nuptial agreement they both wanted.[1] He represented neither party, but provided them with a form agreement as a starting point, and advised them to consult another attorney competent in matrimonial law. Neither party followed his advice. Rather, Appellant retyped the form, filling in the blanks, and attached the schedules of their respective assets. The agreement was signed in front of the guests at their wedding ceremony in June of 1981. In June of 1983, a postnuptial agreement was also executed.

¶ 4 In 1979, after Appellee's job was terminated, he began his own translation firm, The Corporate Word, which grew to the point that in March of 1996 it was sold for $4.2 million. Appellee retired, although Appellant continued to work, taking a job as vice-president of a public relations firm in early 1999. Later that year, after discovering that Appellant was conducting an affaire with her new employer, Appellee commenced divorce proceedings.

¶ 5 Prior to entry of the divorce decree in November of 2001, Appellant instituted proceedings for support, APL, counsel fees, and costs, disputing the disclosure of assets and the validity of the pre and post nuptial agreements. After a hearing, the trial court entered an order on July 25, 2001, concluding that full disclosure had, in fact, been made and that the agreements were valid, binding, "and preempt the parties' rights under the Divorce Code, but only to the extent that those statutory rights relinquished are specified in the Agreements. *See Ebersole v. Ebersole*, 713 A.2d 103, 104 (Pa.Super.Ct.1998); *Mormello v. Mormello*, 452 Pa.Super. 590, 682 A.2d 824, 828 (1996)." (Order, dated 7/25/01, at 1–2). An equitable distribution hearing was scheduled, and both parties' exceptions to the master's report disposing of their economic claims were denied. The order adopting the master's recommendations[2] made final and appealable the July 25, 2001, order. Both parties appealed, challenging the validity of their agreements.[3]

¶ 6 Prior to the trial court's preparation of an opinion, however, the Pennsylvania Supreme Court in *Stoner v. Stoner*, 572 Pa. 665, 819 A.2d 529 (2003), overruled *Ebersole* and *Mormello*. We accordingly vacated the order making final the master's recommendations, determined to be nullities certain other orders requiring Appellee to post bond, and remanded for further proceedings in consideration of *Stoner*. After trial in December of 2004,

---

1. Appellant claims she did not desire an agreement. (Appellant's Brief at 23). However, according to the trial court, Mr. Krivoshia, apparently credibly, testified otherwise. (Trial Ct. Op., 12/12/05, at 2).

2. The master awarded each party 50% of all property acquired during the marriage, including the proceeds from the sale of The Corporate Word, denied Appellant's requests for counsel fees and alimony, but awarded her $814 per month in APL.

3. *Stackhouse v. Zaretsky*, Nos. 934, 1136, 1137 WDA 2003, unpublished memorandum (Pa.Super. filed April 19, 2004).

the trial court entered the order underlying the instant appeals.

¶ 7 Appellant now contests the trial court's: 1) finding that both the parties' agreements were made in contemplation of divorce as well as death; 2) termination of her APL; 3) failure to award her alimony and a greater share of the marital estate; 4) failure to order that certain funds, plus interest, which Appellee withdrew from one of his accounts be included in the assets subject to equitable distribution; and 5) failure to order that she receive 6% interest on her share of the marital estate from the date of the master's report to date of distribution.

¶ 8 The resolution of Appellant's first issue, that the trial court erred in refusing to construe the agreements as pertinent only to the death of a party, affects most of her remaining claims. In addressing it, we first note that

> [b]oth premarital and post-nuptial agreements are contracts and are governed by contract law. Moreover, a court's order upholding the agreement in divorce proceedings is subject to an abuse of discretion or error of law standard of review. An abuse of discretion is not lightly found, as it requires clear and convincing evidence that the trial court misapplied the law or failed to follow proper legal procedures. We will not usurp the trial court's fact finding function.

*Paroly v. Paroly,* 876 A.2d 1061, 1063 (Pa.Super.2005) (quoting *Holz v. Holz,* 850 A.2d 751, 757 (Pa.Super.2004), *appeal denied,* 582 Pa. 700, 871 A.2d 192 (2005) (internal citations omitted)).

¶ 9 Further, "[a]bsent fraud, misrepresentation, or duress, spouses should be bound by the terms of their agreements." *Simeone v. Simeone,* 525 Pa. 392, 581 A.2d 162, 165 (1990). "[T]he principles applicable to antenuptial agreements are equally applicable to postnuptial agreements, although the circumstances may slightly differ." *Stoner, supra* at 533 n. 5. In both instances, the rules of contract interpretation require that the intent of the parties be ascertained and given effect. *Lang v. Meske,* 850 A.2d 737, 739 (Pa.Super.2004). "When the trier of fact has determined the intent of the parties to a contract, an appellate court will defer to that determination if it is supported by the evidence." *Id.* (citation omitted).

¶ 10 The crux of this action is whether the language of the ante nuptial agreement contemplates only procedures to be applied in the event of a party's demise, as Appellant contends and as the master found, or whether its provisions are also germane to divorce, as the trial court concluded. The burden of Appellant's song is that "the parties did not identify the equitable distribution of marital property, alimony, counsel fees and other legal rights arising under the Divorce Code as rights which they intended to waive in their Agreements." (Appellant's Brief at 17). In support she relies on the irrelevancy of the parties' subjective state of mind in the determination of their intent, and on the master's finding that because there was no specific waiver of the economic claims appurtenant to divorce, none occurred. In this Appellant attempts to reconcile her position with the *Stoner* principle that ante and post nuptial agreements may be enforceable even absent a demonstration that statutory rights such as alimony, counsel fees, and support have been disclosed. *See id.* at 533. In short, she contends that although no disclosure of these rights is necessary, any waiver of such rights must be specific. We are unpersuaded; under Appellant's schema legitimate waiver must be preceded, or at least accompanied by, knowledge of what is being foregone, otherwise express or specific waiver does not

exist. However, as our Supreme Court held in *Stoner*, "[w]e expressly reject an approach which would allow the court to inquire into the reasonableness of the bargain, or the parties' understanding of the rights they were relinquishing." *Id.* at 533; *see Simeone, supra.*

¶ 11 The trial court here observed that although the language of the agreement is less than crystal clear, it contains sufficient information to permit the inference that property division in the event of divorce is also addressed, albeit indirectly. Specifically the court based its finding on the fact that "[r]elevant provisions ... include a recital of an intention that the assets of each [party] remain separate after the solemnization of the marriage, a paragraph requiring each to maintain separate accounts and pay for proportionate usage of food and household expenses and paragraphs limiting the liability of the estate of a deceased party to the survivor to $10,000." (Trial Ct. Op. at 4). The agreement clearly provides, too, that in the event of divorce, even the $10,000 is no longer forthcoming, but that the remainder of the agreement, strict separation of assets, remains in force. In connection with the maintenance of discrete financial accounts and proportionately shared expenses, the agreement also provides that "[n]either party shall be liable for any claims of any kind against the other party unless agreed to in writing." (Ante Nuptial Agreement, 6/26/81, at ¶ 2). In connection with the provision for payment after the death of a party, the agreement affirms that "[t]he second party [identified previously as Appellant] agrees to release and hereby releases unto the first party [Appellee] all right, title, and interest in all real and personal property of the first party, whether now owned or hereafter acquired, and all claims thereto [except the $10,000 death benefit and other death related rights] and all other statutory rights arising by reason of marriage." (*Id.* at ¶ 4).

¶ 12 The court also found that the conduct of the parties during the marriage make Appellant's "death only interpretation appear ridiculous." (Trial Ct. Op. at 5). For example, Appellant's (separate) record keeping was so meticulous that she, a vegetarian, assigned the cost of 100% of meat purchases to Appellee. The prenuptial agreement required a written agreement of the terms of joint ownership for the acquisition of joint investments, and a 1983 document testifies to joint ownership of two parcels of real estate. Nothing memorializes any interest of Appellant in The Corporate Word.

¶ 13 Interestingly, Appellant advances the somewhat disingenuous contention that "[w]hat the language of the [ante nuptial] agreement does evidence is an intent to keep separate property separate **during the marriage**—a way to handle day to day finances—but it plainly does not address the contingency of divorce." (Appellant's Reply Brief at 2) (emphasis original). The illogic of this is remarkable, assuming as it does that such very specific and very draconian strictures as waivers of "all right, title, and interest in all real and personal property whether now owned or hereafter acquired," disclaimers of liability for "any claim of any kind" against the other party, and relinquishment of "any and all other statutory rights arising by reason of marriage" were necessary in order to keep track of "day to day finances." (*See generally*, Ante Nuptial Agreement). How these limitations would differ from language designed to keep separate property separate under any and all conditions, divorce as well as death, Appellant does not explain. We are thus convinced that the trial court's conclusion that the agreement encompasses divorce as well as death was indeed properly reached.

¶ 14 However, the court also found that the agreement, although applicable to divorce, was germane "only to the equitable distribution of property claim." (Trial Ct. Op. at 1). Its rationale for this inconsistent conclusion is based on finding "no significant evidence that the pre-nuptial agreement contained a meeting of the minds on issues other than their separate property." (*Id.* at 5). It therefore voiced its belief "that these other issues (equitable distribution of jointly owned property, alimony, alimony pendente lite and counsel fees) therefore must be decided under the Divorce Code." (*Id.*). The court accordingly allotted half of all jointly owned property to each party, awarded no alimony to either, and while terminating Appellant's APL as of June 25, 2005, provided her with $80,000 in counsel fees. It is the last matter, along with his claim of trial court error in failing to make its termination of Appellant's APL retroactive to July 25, 2001, which forms the basis for Appellee's cross appeal, while Appellant argues that her APL should have been continued beyond that date.

■ ¶ 15 Appellant's contention is resolved by our conclusion, already discussed, that any right to continuation of such payments beyond June 25, 2005, has been waived by the language of the ante nuptial agreement. Insofar as Appellee's claim is concerned, however, the order referred to, as noted above, found that full disclosure of the parties' assets had been made, that both the pre and post nuptial agreements were binding and preempted the parties' rights under the Divorce Code, but that they did so only to the extent that those rights which had been relinquished were disclosed in the agreements. Under prior law, this ruling would have been upheld; *Stoner* was decided in March of 2003, and its effect on the instant matter not determined until the trial court's order of June, 2005, the termination date. We therefore find no error in the court's refusal to make retroactive its termination of Appellant's APL.

■ ¶ 16 For approximately the same reason, we decline to vacate that portion of the order concerning counsel fees, which were awarded in consideration of litigation prior to the award.[4] Moreover, as this Court has noted in *Diament v. Diament,* 816 A.2d 256, 270 (Pa.Super.), we may reverse a grant of attorney's fees only upon a showing of plain error, that is, "where the decision is based on factual findings with no support in the evidentiary [record] or legal factors other than those that are relevant to such an award." *Id.* Here, the trial court observed that the purpose of counsel fee awards is to place the parties on an equivalent financial footing for purposes of maintaining or defending a divorce action. (Trial Ct. Op. at 8). *See, e.g., Teodorski v. Teodorski,* 857 A.2d 194, 201 (Pa.Super.2004). Although Appellant's income removes her from the ranks of the dependent spouses unable otherwise to become or remain parties to such actions, her resources[5] are considerably less than Appellee's, an imbalance rectified by the award of counsel fees.

■ ¶ 17 As to Appellant's claim that she was wrongly deprived of alimony, we are guided by this Court's decision in *Sabad v. Fessenden,* 825 A.2d 682 (Pa.Super.2003), *appeal denied,* 575 Pa. 697, 836 A.2d 122 (2003). There the Court resolved, *inter alia,* the question of whether

---

**4.** Appellant testified at the hearing of December 8, 2004, that her legal fees and expenses to date totaled· $98,000. (N.T., 12/8/04, at 34).

**5.** Appellant testified that her income from a full time public relations job and part time translating was over $100,000 in 2004. (N.T., 12/8/04, at 27–29.)

in their ante nuptial agreement the parties had waived "rights to pension benefits that could eventually be considered marital property." *Id.* at 697. In finding that they had done so, the Court observed that "[t]he parties employed unambiguous language in their agreement providing that the property they had or would acquire was to remain their separate property. The parties retained their absolute and unrestricted right to dispose of their separate property." *Id.* For this same reason we find Appellant's claim for wrongful deprivation of alimony, a right appurtenant to marriage, waived by the language of the agreement. Similarly without merit is her insistence that funds withdrawn by Appellee, from an account she concedes was his, should have been returned and subjected to equitable distribution.

¶ 18 Of Appellant's two remaining, related, claims, the first posits an alimony award as the alternative to a greater, that is, 60% rather than 50%, share of the parties' joint property, which share Appellant argues should have been enhanced by 6% interest from the date of entry of the master's report, July 31, 2002, to date of distribution, October 31, 2005. Her alimony claim has already been disposed of above by our conclusion that any right to such payments has been waived. The same result applies to any claim for equitable distribution. Indeed, the only property identifiable as a jointly titled marital asset not already covered by the post nuptial agreement [6] is the marital residence. The stipulated value of this property, which was awarded to Appellee under the master's distribution scheme, was $235,908 as of August 2002.

¶ 19 Appellant suggests that a majority share of marital property be allotted to her

with reference to the factors enumerated in 23 Pa.C.S.A. § 3502(a):

(1) The length of the marriage.

(2) Any prior marriage of either party.

(3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties.

(4) The contribution by one party to the education, training or increased earning power of the other party.

(5) The opportunity of each party for future acquisitions of capital assets and income.

(6) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits.

(7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker.

(8) The value of the property set apart to each party.

(9) The standard of living of the parties established during the marriage.

(10) The economic circumstances of each party, including Federal, State and local tax ramifications, at the time the division of the property is to become effective.

(11) Whether the party will be serving as the custodian of any dependent minor children.

23 Pa.C.S.A. § 3502(a).

¶ 20 Appellant argues that Appellee is in good health, active, and clearly capable of earning a substantial income. The same could be said of Appellant. Both parties

---

**6.** The agreement includes two pieces of realty owned 75% by Appellee and 25% by Appellant.

have significant assets, Appellee's more so than Appellant's, including operative businesses, although Appellant's translation business has no name. At the same time, Appellee has deficits Appellant does not: he is 60 years old and suffers from a hearing impairment so severe as to be only partially alleviated by an electronic device. His employability is therefore limited, whereas Appellant holds a full time job as the vice president of a company owned by her paramour, and provides translation services. Thus we find that after considering all of the factors enumerated by the statute, the trial court did not err in its equal distribution of the parties' sole item of jointly owned marital property. Although Appellant is owed interest on her 50% share of this property, the interest runs only from the distribution, that is, from the order of June 25, 2005.

¶ 21 Accordingly, we affirm in part, reverse in part, and remand for proceedings to implement this opinion. Jurisdiction is relinquished.

¶ 22 ORIE MELVIN, J. concurs in the result.